IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO

**QUENT SCAGGS**,

]               Case No.  18-cv-1784

Applicant

v.

**RICK RAEMISCH** Exec Director
Colorado Dept of Corrections
**CYNTHIA COFFMAN**,
Attorney General, State of Colorado,
**MATTHEW HANSEN**, warden SCCF
Respondents.

**Petition for habeas corpus**

**Pursuant to 28 U.S.C.
section 2254**

---

**APPLICATION FOR A WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2254
BY A PERSON IN STATE CUSTODY**

---

The Applicant, Quent Scaggs, by and through his Counsel counsel, hereby submits her Application for Writ of Habeas Corpus.

## I.    JURISDICTION AND CONVICTION UNDER ATTACK

The Petition is filed pursuant to 18 U.S.C. section 2244(d)(1).

1.    Mr. Scaggs challenges his conviction in Denver County District Court case number 2008CR5518.

2.    Aaron Garcia ("A.G.") was shot and killed in a car by a lone gunman he knew only as "Scar."  Mr. Scaggs was charged with this homicide.  Following trial, Mr. Scaggs was convicted of Murder in the First degree-after deliberation, felony murder, second degree kidnapping, aggravated robbery, and two habitual criminal counts. He

1

was acquitted of an additional count of second degree kidnapping.  He was sentenced to life without parole plus 96 years imprisonment.   Mr. Scaggs appealed to the Colorado Court of Appeals (10CA1353), and his conviction and sentence were affirmed.

On his direct appeal, Mr. Scaggs' Petition for Writ of Certiorari to the Colorado Supreme Court was denied on March 11, 2013.  Ninety days after that date was June 10, 2013.  Therefore, any Petition for Writ of Certiorari was due to the US Supreme Court on June 10, 2013 (the day the federal one year clock was tolled on the 193rd day).

Mr. Scaggs filed his Rule 35(c) motion on December 19, 2013, which was denied.  Mr. Scaggs appealed, and the Colorado Court of Appeals affirmed.  Mr. Scaggs' Petition for Writ of Certiorari was denied on January 22, 2018 (the date the federal one year clock restarted with 172 days left on the clock).

3.      A "properly filed application for state post-conviction or other collateral review" tolls the period. 28 U.S.C. § 2244(d)(2).  A properly filed motion under either Colo. R. Crim. P. 35(b) or 35(c) tolls the limitations period.  *Robinson v. Golder,* 443 F.3d 718, 721 (10th Cir. 2006).   Therefore, this Petition is timely filed on day 365.

## II.    FACTS

On October 30, 2008, at about 7:30 p.m., J.R. picked up A.G. to go to the payday loan store in Stapleton. 4-8-10 pp. 8-10, 12-13. A.G. was on his cell phone with a drug dealer he knew as "Scar" (and who J.R. later identified as Mr. Scaggs). Scar came out of a house on Leyden Street, between 35th and 36th streets, and got in the back passenger seat behind A.G.  J.R. soon heard the clicking of a gun and then Scar yelled at him to pull over, so he did.  Scar patted them down and then told them to drive to the

2

Walmart.  Scar asked for the money and A.G. told him that a friend at Walmart had it. In the parking lot, A.G. started to get out of the car, telling Scar that he was going to get the money, but Scar yelled at him to get back in the car, hit him in the head with the gun, and demanded the money.  J.R. took off running as Scar drove away.  Later, A.G. was found dead in the car.

In his initial contact with the police, J.R. gave them a description but left out the part about buying drugs. J .R. said the man used a revolver, and wore dark jeans, a red tee shirt with short sleeves and a black "doo rag."  The police took him to view some people they had detained. According to J.R., the clothes the first person was wearing matched, but he was not so sure about the face.  They then took him to view two other people. One of those two looked more like the shooter but he was wearing different clothes; the other one was definitely not the person.   J.R. was not completely forthcoming. He did not tell the police that they were looking to buy drugs until he found out A.G. had died.  He did not tell the police money was actually hidden in the car because there were two ecstacy pills there also. *Id.* p. 41. The following day he was shown a photo array and he told the detective that number 4 (Mr. Scaggs) "looked like him."

Lora Stewart, a Walmart customer, looked at the car when she heard a "pop."  As somebody from the backseat climbed over to the front seat to drive off, she noticed that he was a bigger guy because his legs were long and he was having a hard time getting from the back to the front seat.

Denver Police patrol officer Daniel Andrews was dispatched to go to the area of

3341 Oneida, the home of a possible suspect (Dontae Carter) who may have been involved at an automobile theft at Walmart.  Carter's name came up because the name moniker "Scar" was run through the gang data base and it came back to Dontae Carter. He did not see anything so he returned to patrolling. He then received a dispatch about an automobile theft at the Walmart, ands another possible suspect (Dontae Carter) with an address of 3341 Oneida so he went to the area.  Officer Andrews saw the stolen vehicle in the alley of the 3600 block between Newport and Oneida.

Officer Christopher Parker searched the neighborhood the following day for evidence.  He observed a broken window in a vacant house at 3670 Newport.  He looked in and saw a gun on the ledge.  That gun was later identified as the murder weapon.  DNA analysis on the barrel of the gun revealed a mixture – the major source was A.G. , the minor source an unknown female.  Mr. Scaggs was excluded as a contributor.  On the grip, there also was a mixture– the major source was A.G., and there were two minor sources– one female and one male. Mr. Scaggs could not be excluded as a contributor but it was very weak (only three out of thirteen alleles).

In a tree in the front yard, about twenty feet up, there was a red shirt and a "do rag."  DNA from this "do rag" was a mixture and Mr. Scaggs could not be excluded.  On the red tee shirt, the major source of the blood matched the DNA of the victim, A.G. On the bottom of the shirt there was a mixture of semen and saliva. The semen matched Mr. Scaggs, and the saliva was an unknown female.

The number that A.G. was calling during the time immediately before he was shot was traced to a cell phone belonging to Jordan Kimble.  Mr. Kimble gave various

accounts of how his cell phone could have been involved, initially telling the police that he left his phone on a bus but eventually giving a different account.  Mr. Kimble testified that a few days prior to the October 30, 2008 incident, he had met Mr. Scaggs at a gas where Mr. Scaggs offered to sell him some marijuana. About 30 minutes later he met, Mr. Scaggs in an alley at 36th and Leyden Street. Mr. Scaggs asked to use his phone, but when he handed it over, Mr. Scaggs pulled out a gun and demanded money.

Officer Mulhern stopped Mr. Scaggs and Ivan Maxwell in a park near the scene of the shooting.  Mr. Scaggs was patted down for weapons and ordered to sit on the curb. Other officers arrived, and Mulhern ran Mr. Scaggs through NCIC.  There were at least five officers present at the park during Mr. Scaggs' detention.  He was in handcuffs because he was being detained pending further investigation – according to an officer (not Officer Hancock).  Officer Hancock testified that, when he arrived at the park, no one was with Mr. Scaggs.  The officer stated that Mr. Scaggs was sitting on the police car when he arrived.  The officer, testified that after he told Mr. Scaggs that the detectives wanted him to go down to the police station Mr. Scaggs agreed to go and he relayed this information to the detectives.  He could not recall if Mr. Scaggs was handcuffed, because it was dark and Mr. Scaggs was in the back of the police car.

After the show up, Mr. Scaggs was detained further and transported to a secure area of the police station where he was eventually swabbed for gun short reside, at which time the handcuffs were removed.  The Officer initially made contact with Mr. Scaggs at 10:00 p.m. and at 2:30 a.m. he was relieved by Officer Torgeson (testimony of Officer Urlock).

At 5 a.m., Detective Campbell interviewed Mr. Scaggs on videotape for about 12 minutes.  The detective asked Mr. Scaggs about his whereabouts the previous evening. After initially answering a few questions, Mr. Scaggs stated that he did not wish to answer any further questions and eventually asked for an attorney. He was told that if he wanted to remove himself as a suspect he should talk. Mr. Scaggs respectfully declined to talk and asked for an attorney.  He was told that because he was not read his rights he was not entitled to an attorney.   The detective continued the interview. Whenever Mr. Scaggs indicated he had nothing to say, the detective continued with the questions.   Mr. Scaggs filed a motion to suppress the statements he made during this interview.  The Denver District Court made the following ruling:

Pursuant to *People v. Polander*, 41 P.3d 698 (Colo. 2001), the test for determining whether an individual is in custody thus triggering *Miranda*, was not whether he was free to leave but rather whether such a person would believe he was in police custody to the degree associated with arrest rather than a brief investigatory detention.  There was reasonable suspicion for the initial stop of Mr. Scaggs and Mr. Maxwell, and the "mere" placing of handcuffs on an individual did not "change the nature or the contact to an arrest," since it was reasonable to place Mr. Scaggs and the other individual in handcuffs for "officer safety."  The handcuffs remained on Mr. Scaggs until his hands were swabbed at the police station.

Relying on Officer Hancock's testimony, the Denver District court found that while still in handcuffs, Mr. Scaggs was asked by the Officer if he would go downtown and Mr. Scaggs "agreed."  The court ruled that there was a *Terry v. Ohio,* 392 U.S. 1 (1968) type detention until the handcuffs were removed at the police station, and after that, Mr.

Scaggs' continued presence at the police station (presumably for the next six plus hours) was voluntary and he was no longer in detention.  The Denver District court found that although the fact that he was released or that he did not think he was under arrest was not determinative, it was a factor when considering the totality of the circumstances along with whether the interview was accusatory or confrontive (the court said it was not). Ultimately the court concluded that because the detective told him he was not under arrest, he was not in custody and *Miranda* was not triggered.

Mr. Scaggs also moved to suppress his identification made by the suggestive photo array – another motion the Denver District Court denied.

At the show-up, approximately ten blocks from where the crime occurred, J.R. ruled out Mr. Maxwell as the perpetrator but said it was possible that Mr. Scaggs was the perpetrator. The following day, when shown five "filler" photographs and a photograph of Mr. Scaggs, again he said that Mr. Scaggs maybe the individual.  By the time the case went to trial, J.R. was no longer equivocal.  He testified that Mr. Scaggs was the individual who shot his friend.

According to J.R., he was driving and Aaron was in the passenger seat.  There was a street light near where he picked up the man they called "Scar" or "Scarface." This man sat in the backseat as J.R. drove for ten blocks to the WalMart.The entire incident, from when they picked up the individual until his friend wasshot and J.R. took off running lasted approximately 20 minutes.  Officer Mercado testified at the motions hearing that J.R. told her that the robber was a black male, between 5'8" and 5'11" who used the name Scar or Scarface.  She ran the name Scarface in the NCIC and CCIC

data base and it came back as a moniker used by an individual named Dontae Carter. She took J.R. over to the 3600 block of Oneida where his white Grand Am had been found.  She told him that they had a possible suspect in custody.  That suspect was taken out of the back of a police cruiser, and a spot light was shined on him.  From the backseat of Officer Mercado's police cruiser, J.R. said that it was possibly him (the clothing matched) but he was not sure.  The officer then took J.R. to see Mr. Scaggs and Mr. Maxwell, who were in custody in the 3900 block of Newport.  The same procedure was used. J.R. said it was possible but he was not certain as to the first (this was Mr. Scaggs) but definitely not as to the second (Mr. Maxwell).

Detective Larry Moore met with J.R. the following day.  According to the detective, when asked, J.R. told him he did not see a scar on the person who shot his friend and did not see a scar on any of the persons he saw the night before. He asked him this because the name Scarface kept coming up,and because Mr. Scaggs has a scar on his face.  The detective testified that when he spoke with J.R. the following day hetold him that the suspect in the first location had the right clothes but was not the person; J.R. said that he could not clearly see his face during the show-up, because the suspect was too far away but he could see that he was wearing the same thing.

As for the show up in the second location – the one involving Mr. Scaggs –the first person (Scaggs) looked like the person but had on different clothes; andthe second person (Maxwell) was definitely not involved. *Id.,* pp. 25-26.  The next day, J.R. said the second person (Maxwell) definitely was not the person, but the second (Scaggs) looked more like the person than the first one (suspect in first show-up).  The detective acknowledged that Officer Mercado's report indicated that J.R. was uncertain as to

whether it was the first individual or the second individual, and he further acknowledged that J.R. was not certain as to whether the second individual was in fact involved.

The following day J.R. contacted the police and told them that if they showed him some photographs, he could probably identify the person. He was shown an array that included Mr. Scaggs in the number 4 position. He circled number 4 and told the detective that it might be the person. When asked about his level of certainty he said he was more certain than not. When the trial took place some 18 months later, J.R.'s level of certainty changed from maybe to definitely. The Alaska Court of Appeals, in *Tegoseak v. State*, 221 P.3d 345, 362 (Alaska App. 2009) noticed the same phenomenon in that case. The Court suggested that this was arguably an example of the kind of altered memory and altered certainty described in the research literature. *Id.*

The Denver Court ruled that while the photo lineup itself was not suggestive, it had to consider the previous show up and the fact that the individual in the show up (Mr. Scaggs) was also in the photo array. The court listed the five factors it used to determine if there was a sufficient basis for making an identification. *Ibid*. The court ruled that there was a sufficient independent basis, because J.R. saw the individual when he walked up to the car; when the search for weapons happened he was a foot away from him; he was right there when his friend was pistol whipped and the lighting was adequate. The court placed no weight on the uncertainty of the identification. *Ibid.*

## III. STANDARD OF REVIEW

A state prisoner seeking federal habeas corpus relief after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA),

must meet the provisions of the Act. *Lindh* v. *Murphy,* 521 U.S. 320, 327,117 S. Ct. 2059 (I997); *Hain* v. *Gibson,* 287 F.3d 1224, 1229 (l0th Cir. 2002) (citing *Wallace* v. *Ward,* 191 F.3d 1235, 1240 (l0th Cir. 1999), *cert. denied,* 530 U.S. 1216 (2000)).

Under the AEDPA, a habeas petitioner in state custody is entitled to relief if the decision of the state courts resolving the claim against him "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. Section 2254(d)(I), (2); *Williams* v. *Taylor,* 529 U.S. 362, 402-03, 120 S. Ct. 1495, 1518 (2000); *see also Van Woudenberg v. Gibson,* 211 F.3d 560, 566 (l0th Cir. 2000), *cert. denied,* 531 U.S. 1161 (2001); *LaFevers v. Gibson,* 182 F.3d 705, 711 (l0th Cir. 1999).

A state court's decision is "contrary to" established federal law as determined by the Supreme Court "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams,* 529 U.S. at 405-06, 120 S. Ct. at 1523; *Van Woudenberg* v. *Gibson,* 211 F.3d at 566.

A state court's decision involves an "unreasonable application of" Supreme Court or Tenth Circuit precedent "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams,* 529 U.S. at 407, 120 S. Ct. at 1513; *Van Woudenberg* at 566.

A state court's decision is "based on an unreasonable determination of the facts in light of the evidence presented" where, for example, the state court's recitation of

factual circumstances supporting its ruling is unsupported by the record. *See, e.g., Paxton* v. *Ward,* 199 F.3d 1197, 1210-11 (l0th Cir. 1999) (reversing state's denial of relief under section 2254(d)(2) where state court admitted hearsay as excited utterance based on child declarant's presence at shooting, declarant's "short" possible exposure to adults who "may or may not have been talking about the shooting," and declarant not having slept between event and statement, but record showed child did not recall whether she witnessed shooting or heard about it, exposure to adults was for "a considerable period," adults did discuss the shooting, and evidence permitted inference that child had slept between event and statement). *See also Williamson* v. *Ward,* 110 F.3d 1508, 1513 n.6, n.7 (10th Cir. 1997) (noting in pre-AEDPA case that the Court would find unreasonable determination of facts under section 2254(d)(2) of AEDPA where state court's decision was "undermined by factual assertions that are contradicted by the State's own evidence").

Though habeas relief may not be grounded in the jurisprudence of inferior federal courts, such case law is relevant to whether a state court's resolution of the federal claim is "contrary to" or "involved an unreasonable application of" Supreme Court precedent. *E.g., Bryson* v. *Ward,* 187 F.3d 1193, 1205 (l0th Cir. 1999) (citing *O'Brien* v. *DuBois,* 145 F.3d 16, 21,25 (lst Cir. 1998)).

The Sixth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." United States Constitution amendments VI, XIV. Because the assistance of counsel is necessary to protect the fundamental right to a fair trial, the

Supreme Court has long recognized that "the right to counsel is the right to the effective assistance of counsel." *McMann* v. *Richardson,* 397 U.S. 759, 771 n.l4 (1970) (citing *Powell* v. *Alabama,* 287 U.S. 45, 57 (1932)); *Osborn* v. *Shillinger,* 861 F.2d 612,624 (10th Cir. 1988).

The constitutional right to effective assistance of counsel includes the right to have an attorney acting as a diligent and conscientious advocate. *Strickland v. Washington,* 466 U.S. 668 (1984)*; United States v. Cronic,* 466 U.S. 648 (1984)*; Powell v. Alabama,* 287 U.S. 45 (1932)*; People v. Davis,* 871 P.2d 769 (Colo. 1994).

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Court created the now well-known two prong analysis for review of ineffective assistance claims.   The court must first determine whether "in light of all circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."   *Id*. at 690.  To be afforded relief, the accused must then show that the deficient representation somehow prejudiced the defense.  *Id*. at 687.  To prove prejudice, Mr. Armelino must show "that counsel's errors were so serious as to deprive Mr. Armelino of a fair trial, a trial whose result is reliable."  *Id*. at 687.  In order to establish the requisite prejudice, the accused need only show that there "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.

The accused need not demonstrate that he would have been acquitted "but for" the performance of his trial counsel.  To the contrary, he must only demonstrate "a probability sufficient to undermine confidence in the outcome."  *Id*. at 694.

This constitutional guarantee is violated when an attorney's performance falls below an objective standard of reasonableness as informed by prevailing professional norms, and there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland* v. *Washington,* 466 U.S. at 687-88, 694; *United States* v. *Haddock,* 12 F.3d 950 (10th Cir. 1993); *see also Williams* v. *Taylor,* 529 U.S. at 390-91; *Kimmelman* v. *Morrison,* 477 U.S. 365, 382, 106 S. Ct. 2574 (1986) (adopting *Strickland* test as appropriate standard for measuring ineffective assistance of counsel claims raised in habeas proceedings).   A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland,* 466 U.S. at 694.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the U.S. Supreme Court noted, "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Id*. at 690-91.  "Consequently, even where an attorney pursued a particular course of action for strategic reasons, courts still consider whether that course of action was objectively reasonable, notwithstanding Strickland's strong presumption in favor of upholding strategic decisions."  *Bullock v. Carver*, 297 F.3d 1036 (10th Cir. 2002); *see also Garrett v. Gibson*, 282 F.3d 1283, 1296 (10th Cir. 2002) ("mere incantation of 'strategy' does not insulate attorney behavior from review"); *Phoenix v. Matesanz*, 233 F.3d 77, 82 n.2 (1st Cir. 2000) ("'virtually unchallengeable' does differ from 'unchallengeable,'" and the test is whether challenged acts or omissions were outside range of competent assistance); *Washington v.*

*Hofbauer*, 228 F.3d 689, 703-04 (6th Cir. 2000) (even where challenged omission was strategic, reviewing court "cannot stop there, [but] … must also assess if this strategy was constitutionally deficient").

Allegations of prosecutorial misconduct are mixed questions of fact and law that we review de novo. *Ferro v. Kerby,* 39 F.3d 1462, 1473 (10th Cir. 1994). Ordinarily, a prosecutor's misconduct will require reversal of a state court conviction only where the misconduct sufficiently infected the trial so as to make it fundamentally unfair, and, therefore, a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). Nonetheless, "when the impropriety complained of effectively deprived the defendant of a specific constitutional right, a habeas claim may be established without requiring proof that the entire trial was thereby rendered fundamentally unfair." *Mahorney v. Walllmani,* 917 F.2d 469, 472 (10th Cir. 1990), *citing DeChristoforo,* 416 U.S. at 643.  Inquiry into the fundamental fairness of a trial requires us to examine the effect of any misconduct within the context of the entire proceedings. *DeChristoforo*, 416 U.S. at 643.  In order to view any prosecutorial misconduct in context, "we look first at the strength of the evidence against the defendant and decide whether the prosecutor's statements plausibly could have tipped the scales in favor of the prosecution .... Ultimately, we must consider the probable effect the prosecutor's [statements] would have on the jury's ability to judge the evidence fairly." *Fero*, 30 F.3d at 1474 (quotations omitted).

## IV.   THE COLORADO COURTS' DENIALS OF THE APPLICANT'S CONSTITUTIONAL RIGHTS IS CONTRARY TO ESTABLISHED FEDERAL LAW OR INVOLVES AN UNREASONABLE APPLICATION OF FEDERAL LAW

Mr. Scaggs raises the following issues in this petition:

**The Denver District Court and the Colorado Court of Appeals violated Mr. Scaggs' Constitutional Rights by not suppressing his custodial statements at the police station.**

*Miranda* defines custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." *Miranda v. Arizona*, 384 U.S. 436,444 (1966). The first step is determining whether there was an interrogation. Here, that issue is not in dispute. The more difficult task is determining if Mr. Scaggs was "in custody." It is not disputed that the *Miranda* warnings were not given prior to the first interview. If Mr. Scaggs was in custody during that interview, then the failure to give the warning must result in the suppression of the statement. Mr. Scaggs contends that the state courts' resolution of this factual issue of whether or not he was "in custody" was clearly erroneous in light of the record.

In *Berkemer v. McCarty*, 468 U.S. 420 (1984), the Court held that a routinetraffic stop was non-custodial as it is "presumptively temporary and brief [and]circumstances associated with a routine traffic stop are not such that a motorist feels completely at the mercy of the police." *Berkemer*, 468 U.S. at 437. The question is whether "the suspect's freedom of action has been curtailed to a degree associated with formal arrest. *Berkemer*, 468 U.S. at 441 quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam). The standard is objective: would a reasonable person feel that he is free to leave or otherwise end the encounter? *Berkemer, supra.* Thus, this Court must examine the circumstances surrounding the interrogation, and determine whether there existed a formal arrest on freedom of movement of the degree associated with a formal arrest such that a reasonable person in the suspect's position would would

believe that his freedom of action had been curtailed to a degree associated with formal arrest. *Berkemer, supra.*  This is an objective test.  The thequestion is not whether Mr. Scaggs believed that his freedom had beensufficiently curtailed to a degree associated with an arrest. Rather, the question iswhether a reasonable person would so believe. *Berkemer, supra.*

In *J.D.B. v. N. Carolina*, 131 S. Ct. 2394 (2011) the United States Supreme Court stated that:

> we have required police officers and courts to examine all of the circumstances surrounding the interrogation, including any circumstance that would have affected how a reasonable person in the suspect's position would perceive his or her freedom to leave.  On the other hand, are the subjective views harbored by either the interrogating officers or the person being questioned.

*Id.,* 131 S. Ct. at 2402 (quotations omitted).  *See also Yarborough v. Alvarado,* 541 U.S. 652, 662–663 (2004); *California v.Beheler,* 463 U.S. at 1125, n. 3.  Applying the law as set forth above the only possible conclusion is that Mr.Scaggs was in custody.

**1) the time, place and purpose of the encounter**. Mr. Scaggs was stopped on the street during an investigation of a homicide. Five or six officers were present. After a show-up, when the witness equivocally identified Mr. Scaggs, he was considered a possible suspect and was handcuffed and his hands bagged to test for gunshot residue. Some officers testified that Mr. Scaggs was handcuffed even before the show up. He was then transported to police headquarters, kept in a secure room for six hours, and interrogated in a small room.  The police's knowledge that a crime had been committed was relevant, as it was apparent from the circumstances that the police had grounds to arrest the defendant.  *See Stansbury v. California*, 511 U.S. 318, 325 (1994).

**2)  The Officer's words**. When Mr. Scaggs indicated that he did not wish to talk and wanted an attorney, he was told that because he was not under arrest he was not entitled to an attorney.  However, throughout the interview, it is clear that Mr. Scaggs was a suspect (in fact he was identified by the surviving victim as possibly being the shooter), he was asked repeatedly to explain where he was prior to being detained and was asked if anyone made him any threats or promises in order to make a statement.

**3_)_the Officer's tone of voice and demeanor**.  While the detective did not raise his voice during the interview, it was clear that the detective believed Mr. Scaggs was involved, pressed him for answers when he declined to talk, and told Mr. Scaggs if he was not involved he would be willing to answer his questions.

**4)   the persons present.**  The persons present were the detective andMr. Scaggs. However, prior to the interrogation, five to six officers were present when Mr. Scaggs was detained; after he was transported to police headquarters he was watched first by one officer and then by another. The second officer stated he would not have released Mr. Scaggs without the detective's approval.

**5) the length or mood of the interrogation.** While the interrogation itself was brief, Mr. Scaggs was transported to the police station and kept in a secure area of the police station for six hours beforehand.

**6)  limitation of Mr. Scaggs' movements**. Mr. Scaggs was handcuffed, transported to the police station, put in a secure area of the police station, and was watched for the next six hours. He could not walk unescorted at the station; when it was time for Mr. Scaggs to be interrogated, he was escorted from the third floor to the second floor and turned over to the detectives.

**7) the Officer's  response to questions.** Contrary to the Denver Court's view of the interrogation, this was not a "give and take."  The detective asked questions, Mr. Scaggs answered a few and then declined to answer and asked for an attorney, the detective continued to ask questions and pressured him.

**8) whether directions were given to Mr. Scaggs**.  Mr. Scaggs was directed to wait in the secured area of the police station until he was escorted tothe second floor to be interviewed by the detective.

**9) Mr. Scaggs' verbal or nonverbal response**. Mr. Scaggs complied with the directions.  He respectfully declined to answer questions without an attorney and was told he was not entitled to one.

The Denver Court's ruling that Mr. Scaggs was handcuffed for officer safety is incorrect as the evidence indicates otherwise.  Mr. Scaggs was not handcuffed during the initial encounter when there was only one officer present or even when the other officers initially arrived. To the contrary, he was not handcuffed until the witness made the equivocal identification, and at that time Officer Salinas ordered that Mr. Scaggs be handcuffed not for officer safety but because he was being detained for further investigation into a homicide and in order to preserve evidence.  Even if the initial encounter was a *Terry* stop, once the witness identified Mr. Scaggs as the potential perpetrator, and Mr. Scaggs was then handcuffed and detained for further investigation, he was in custody triggering the requirement for *Miranda* warnings. Despite Officer Hancock's testimony that he was unsure of whether Mr. Scaggs was handcuffed at the time he first encountered him, the testimony of all of the other officers indicate that by the time Officer Hancock made contact, Mr. Scaggs was already handcuffed and thus

was already in custody.

Because Mr. Scaggs was already in custody when Officer Hancock approached him, the Officer should have read Mr. Scaggs his *Miranda* rights prior to talking to him, and the failure to do so requires that all statements made thereafter must be suppressed. Certainly Mr. Scaggs was in custody (and had been for six hours) when he was interviewed by Detective Campbell and prior tocommencing that interview, the detective should have read Mr. Scaggs his rightsunder *Miranda* and should have obtained a waiver before interrogating him. Failure to do so violated Mr. Scaggs' under the United States Constitution.  U.S. Const., Amend. V, VI, XIV.

The Denver court's reliance on the fact that Mr. Scaggs understood he was not under arrest was misplaced. The issue is not whether Mr. Scaggs was under arrest, but whether he was "deprived of his freedom of action in a significant way at the time of questioning." *Berkemer v. McCarty, supra*; *Oregon v. Mathiason,* 429 U.S. 492 (1977)(*per curiam*); *Miranda, supra.*  A reasonable person in Mr. Scaggs' situation would have believed himself to be deprived of his freedom to the degree associated with formal arrest.

The Denver court was also wrong to focus on Mr. Scaggs' subjective beliefs. An individual's specific beliefs do not control. In *J.D.B. v. N. Carolina*, the Supreme Court held that such things as prior involvement with the justice system have been held to be irrelevant in determining an individual's custodial status:

> because such experience could just as easily lead a reasonable person to feel free to walk away as to feel compelled to stay in place.  Because the effect in any given case would be contingent on the psychology of the individual suspect, the Court explained, such experience cannot be considered without compromising the objective nature of the custody analysis.

*J.D.B. v. N. Carolina*, 131 S.Ct. at 2404 (internal citations omitted).

The burden is on the government to show beyond a reasonable doubt that the trial error did not contribute to the conviction. *Arizona v. Fulminante*, 499 U.S. 279, 307-08 (1991); *Chapman v. California*, 386 U.S. 18, 21-22 (1967). Here, in light of the other evidence, there is a reasonable probability that Mr. Scaggs could have been prejudiced; thus, the error is not harmless. The prosecutor, in closing arguments, played the interrogation again for the jury, and asked the jury to compare the statements made to the alibi testimony presented – specifically highlighting that Mr. Scaggs' statements did not include any mention of an alibi. He did not say that he was working until 8:00 p.m. or that he went to Stephanie Morton's house, etc. The prosecutor brought this subject up again during the rebuttal closing argument and asks the jury to listen to the interview that he gave to Detective Ty Campbell.

The inadmissible evidence not only substantially influenced the verdict, it also affected the fairness of the trial. The prosecutor clearly thought that Mr. Scaggs' statements amounted to a confession and asked the jury to accept them as such. Once it came in, Mr. Scaggs had no alternative but to testify and therefore otherwise inadmissible evidence (a prior robbery conviction, prior incarceration, prior arrests, and gang membership) was brought before the jury through the questions and answers in the interrogation. The admission of the statements was prejudicial, and violated Mr. Scaggs' rights under U.S. Const., Amend. V, VI and XIV. Thus the Colorado Courts obtained and affirmed Mr. Scaggs' convictions in violation of his federal constitutional rights.

At a minimum, the Denver court should have redacted the interview to remove

Mr. Scaggs' repeated requests for an attorney. The argument that if Mr. Scaggs were "truly innocent" he would have freely answered all questions put to him or would not have requested an attorney is contrary to federal law. See, *United States v. Hale,* 422 U.S. 171, 177 (1975).

### The Colorado Courts violated Mr. Scaggs' federal constitutional rights by failing to suppress the suggestive photo array and subsequent identification of Mr. Scaggs.

The primary evil caused by a suggestive confrontation can be a very substantial likelihood of irreparable misidentification. *Neil v. Biggers*, 409 U.S. 188, 198 (1972). In *Neil v. Biggers,* the Court first established the factors to consider in determining whether the subsequent identification was a result of the prior suggestive identification or had an independent basis: opportunity to view the criminal, the witness' degree of attention and accuracy of prior description, the length of time that has passed, and – very importantly – the level of certainty demonstrated by the witness at the confrontation. *Id.,* at 199-200.

The Denver court unreasonably discounted J.R.'s level of uncertainty aboutthe identification. At the show up he said only that Scaggs looked more like therobber than the other two suspects he was shown. This is not a definitive identification. Here J.R. was uncertain both at the show up and after the array. It was not until trial that J.R. became "certain." Because of the uncertainty in the second identification even after the suggestive nature of the first identification, the Denver court should have suppressed the second identification.

Forty years ago, the U.S. Court of Appeals for the Second Circuit recognized that identification testimony is notably fallible and can result in the greatest single injustice

that can arise out of our system of criminal law,..., the conviction of the wrong man through a mistake in identity. *United States v. Evans*, 484 F.2d 1178, 1187 (2d Cir. 1973). *See also State v. Dubose*, 699 N.W.2d 582, 591-594 (Wisc. 2005); *See* Nancy Steblay et al., *Eyewitness Accuracy Rates in Police Showup and Lineup Presentations: A Meta-Analytic Comparison,* 27 L. & Human Behav. 523 (2003); Winn Collins, *Improving Eyewitness Evidence Collection Procedures in Wisconsin,* 2003 Wis.L.Rev. 529; Gary Wells & Elizabeth Olson, *Eyewitness Testimony,* 54 Ann. Rev.Psychol. 277 (2003); Tiffany Hinz & Kathy Pezdek, *The Effect of Exposure to Multiple Lineups on Face Identification Accuracy,* 25 L. & Human Behav. 185(2001); U.S. Department of Justice, *Eyewitness Evidence:  A Guide for Law Enforcement* (1999), *available at* http:// www.ncJ.R.  s.org/pdffiles1/nij/178240.pdf; Gary Wells & Amy Bradfield *Good, You Identified theSuspect:   Feedback to Eyewitnesses Distorts Their Reports of the Witnessing Experience,* 83 J. Appl. Psych. 360 (1998); Gary L. Wells et al., *Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads,* 22L. & Human Behav. 603 (1998); U.S. DOJ, *Convicted by Juries, Exonerated b yScience: Case Studies in the Use of DNA Evidence to Establish Innocence After Trial,* (1996), *available at* http://www.ncJ.R. s.org/pdffiles/ dnaevid.pdf.

J.R. was shown Mr. Scaggs in ashowup the evening before, and then was shown one photo array with Mr. Scaggsand five fillers and asked to make an identification. He then reaffirmed his previous equivocal identification. When this is coupled with the fact that the initial identification procedure was a show up, this Court should view with great skepticism the reliability of any future identification made by the witness.  Studies have questioned the reliability of showups under exactly thesecircumstances. Photo showups

occurring two hours or more after the encounterare notoriously unreliable. One study found that two hours after the encounter,58% of witnesses failed to reject an "innocent suspect" in a photo showup. A.Daniel Yarmey et al., *Accuracy of Eyewitness Identifications in Showups and Lineups,* 20 Law & Hum. Behav. 459, 464 (1996).

### Ineffective Assistance of Trial and Appellate Counsel

In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court outlined the standards for evaluating a claim that a criminal conviction violated an accused's right to effective assistance of counsel.  The Court held that any such claim must satisfy two components: first, defense counsel's performance must have been constitutionally deficient; and second, the deficient performance must have prejudiced the defense of the case. *Id*. at 687.   While an ineffective-assistance claim involves an inquiry into matters of historical fact, the proper resolution of both the performance and prejudice components of the claim is a mixed question of fact and law. *Id*. at 698.

The prejudice component of an ineffective-assistance claim requires the defendant affirmatively to prove prejudice. *Id*. at 693.   While this requirement means that the defendant must establish more than the mere possibility that counsel's errors affected the outcome of the proceeding, **it does not require** the defendant to prove that counsel's errors "more likely than not altered the outcome in the case." *Id*.

Instead, the prejudice component requires the defendant to prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.   A reasonable probability, in this

sense, is "a probability sufficient to undermine confidence in the outcome" of the proceeding. *Id*.

In Strickland, the Court held that "strategic choices made *after thorough investigation of law and facts relevant to plausible options* are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation." *Strickland,* 466 U.S. at 690-91 (emphasis supplied).

"Consequently, even where an attorney pursued a particular course of action for strategic reasons, courts still consider whether that course of action was objectively reasonable, notwithstanding Strickland's strong presumption in favor of upholding strategic decisions." *Bullock v. Carver*, 297 F.3d 1036 (10th Cir. 2002).  See also *Fisher v. Gibson*, 282 F.3d 1283, 1296 (10th Cir. 2002) ("mere incantation of 'strategy' does not insulate attorney behavior from review"); *Phoenix v. Matesanz*, 233 F.3d 77, 82 n.2 (1st Cir. 2000) ("'virtually unchallengeable' does differ from 'unchallengeable,'" and test is whether challenged acts or omissions were outside range of competent assistance); *Washington v. Hofbauer*, 228 F.3d 689, 703-04 (6th Cir. 2000) (even where challenged omission was strategic, reviewing court "cannot stop there, [but] … must also assess if this strategy was constitutionally deficient").

In order to adequately represent a criminal defendant, a lawyer must understand the law and thoroughly investigate the facts and the law.  *People v. White*, 421, 514 P.2d 69, 71  (Colo. 1973).  "Justice cannot be the product of our courts under an adversary system if defense counsel fails to serve as an advocate who is competent and well prepared to represent his client." "*White*, 514 P.2d at 72; *citing* American Bar

Association Standards for Criminal Justice Relating to The Defense Function §§ 1.1(a) and 1.1(b).

Although there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and "[j]udicial scrutiny of counsel's performance must be highly deferential," *Strickland*, 466 U.S. at 689, defense counsel must, "at a minimum, *conduct a reasonable investigation* enabling him to make informed decisions about how best to represent his client," *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir.1994) (emphasis in original); see also *Jennings v. Woodford*, 290 F.3d 1006, 1013 (9th Cir.2002).

A strategic determination of whether to call a particular witness is generally a matter within trial counsel's discretion. *See Davis v. People*, 871 P.2d 769, 773 (Colo. 1994). However, "the consequences of inattention rather than reasoned strategic decisions are not entitled to the presumption of reasonableness." *Mosely v. Atchison*, 689 F.3d 838, 848 (7th Cir. 2012) (citing *Rompilla v. Beard*, 545 U.S. 374, 395-96 (2005), and *Wiggins v. Smith*, 539 U.S. 510, 533-34 (2003)).

Counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The failure to investigate is especially egregious when a defense attorney fails to consider potentially exculpatory evidence. See *Lord v. Wood*, 184 F.3d 1083, 1093 (9th Cir.1999) ("A lawyer who fails adequately to investigate, and to introduce into evidence, information that demonstrates his client's factual innocence, or that raises sufficient

doubts as to that question to undermine confidence in the verdict, renders deficient performance.").

The district court erred by denying Mr. Quent Scaggs' Rule 35(c) motion for postconviction relief following an evidentiary hearing. At the postconviction evidentiary hearing, sufficient evidence was presented to establish that trial counsel provided ineffective assistance of counsel resulting in prejudice. Specifically, trial counsel provided deficient performance by failing to investigate available witnesses Ms. Caroline Herrera, and Mr. Christopher Carter.  They both held critical exculpatory evidence which should have been introduced to the jury. Trial counsel had a duty to investigate potential leads on evidence, and the failure to do so here, fell beneath the applicable standard of care. In one instance, Ms. Herrera was mentioned during a conversation with Defense Investigator Tinnes, in another instance, Mr. Carter walked right up to defense counsel, introduced himself, and informed counsel that he had information about the case that he wished to discuss.  Trial Counsel's failure to investigate, interview, and follow up with the potential witnesses was objectively unreasonable. Furthermore, Mr. Scaggs wass prejudiced by the deficient investigation of trial counsel. Absent the deficient performance of trial counsel, effective counsel would have interviewed Mr. Chris Carter and Ms. Caroline Herrera, and consequently presented evidence that Dontai Carter took Mr. Scaggs' red shirt, that he admitted to the shooting, and that he was seen with a body in a car, and there remains a reasonable probability, that had this information been presented during trial, reasonable doubt would have been formed in the minds of the jury, and the result of the proceedings would have been different. The evidence presented at the post conviction evidentiary hearing sufficiently undermined the

confidence in the outcome of the trial proceedings to merit post conviction relief. Therefore, the conviction was obtained in violation of Mr. Scaggs' constitutional right to effective assistance of counsel.

At the postconviction evidentiary hearing, Ms. Caroline Herrera provided testimony to the court regarding the raised postconviction allegations. Ms. Herrera testified that she knew Mr. Scaggs, and that he was going to live with her and her boyfriend in the Park Hill area, but probation would not allow him to stay in the Park Hill neighborhood. Mr. Scaggs stayed at Caroline's house a couple of days helping her move, and when he left, he left a bag of cloths at her home. Ms. Herrera further testified that people would often come over to her home and hang out; one person that frequented the house was Dontai Carter. She recalled that one day, Dontai Carter walked into her home looking for her boyfriend, who was not there, and then walked into the second bedroom which contained Mr. Scaggs bag of cloths, grabbed a red long sleeve shirt, and walked out.

Next, she recalled that a few days following the death of A.G., Carter again went back to the apartment and spoke with Ms. Herrera, looking for her boyfriend, who was not there. This time, while speaking with Ms. Herrera, Carter said, "he did something very bad," and that the police had "the wrong guy." Ms. Herrera believed that Carter was talking about the murder of A.G. Ms. Herrera did not come forward with the information because she was afraid that she would be harmed if she did. "I just didn't want to put me and my family in that." Eventually, in May of 2010, Ms. Herrera wrote a letter to the courts explaining that she believed that Mr. Scaggs was wrongly convicted. Ms. Herrera felt that if she had come forth with the information, she "probably would not be sitting here today." Ms. Herrera did not believe Mr. Scaggs was guilty of murder.

Mr. Chris Carter testified that on October 30, 2008, he met up with Dontai Carter in a dark alley to buy some ecstasy.   Mr. Carter thought Dontai Carter was acting very strange – "He was more than excited. The man had his shirt off."   When Mr. Chris Carter met up with Dontai Carter in the alleyway, Dontai told him to get out of there. Then Dontai blurted out, "I had to shoot this Mexican that was in the car."   Mr. Carter believed that Dontai Carter was joking, but then he saw him "moving someone and he was slumped over in the front of a vehicle," and then he left.   Mr. Chris Carter did not come forward with the information to the authorities out of fear for his personal safety. However, he did later come forward with his information. He walked up to Mr. Scaggs' second chair counsel, Ms. Lucy Martin, at the Denver District Court House, and told her that he wished to speak with her because he had information regarding Mr. Scaggs' case.   He did not go into detail, but provided his contact information Ms. Martin. (*Id*. at p. 32:2-10).   However, Mr. Carter was not contacted by trial counsel. *Id*.

Second chair trial counsel, Ms. Lucy Martin, provided testimony to the district court and her testimony supported the statements of Mr. Chris Carter.   She stated that sometime in August or September of 2009, while at the Denver District Courthouse, she was approached by a young, good sized, African American male, who said he had information regarding Mr. Scaggs' case that he wanted to discuss.   She did not recall the exchange very clearly, but believed the person who contacted her was Mr. Chris Carter.   She recalled being very busy at the time, and that Mr. Carter did not explicitly inform her that he had exculpatory evidence regarding the case.   Ms. Martin did not interview Mr. Carter at this time, and had no specific recollection of exchanging contact information, but testified that her habit would have been to provide a business card to a

28

person wishing to discuss the particulars of a case. Ms. Martin did not follow up with an interview or phone call. (*Id*. at p. 57:2-3).

Defense investigator Terrance Tinnes testified that when he tried to interview Dontai Carter, but he refused to speak with him. Mr. Tinnes further stated that he did not make efforts to further investigate the matter because it is his practice to not press for information after participation has been refused. Further, he did not attempt to contact Caroline Herrera, but recalled that when he initially met with Mr. Scaggs, he did mention Caroline Herrera, but not Mr. Chris Carter. He testified that he recalled Ms. Herrera being mentioned his first meeting with Mr. Scaggs, and considering such, counsel was deficient in failing to have Ms. Herrera interviewed as well.

Sergeant Mickey Horton testified that Mr. Scaggs is a gang member. He further testified that it is possible for some people to make it out of the gang lifestyle, and that sometimes gang members can be afraid of other gang members within the gang, and turn on one another.

First chair trial counsel, Mr. Demetria Trujillo testified that initially Dontai Carter was a viable alternate suspect. Mr. Carter lived in the general area, was arrested by the police, in the general area shortly after the incident, and witness identification indicated that the shooter could have been Dontai Carter. Mr. Trujillo went on to testify that part of the reason he did not pursue Dontai Carter as an alternate suspect was because the DNA evidence produced was not helpful, and other than proximity to the incident, he could not link Dontai Carter to the forensic evidence. The DNA evidence produced was from a red shirt found at the scene, and it contained mixtures of Mr. Scaggs and A.G.'s

genetic material. He did not request that Mr. Tinnes make any further efforts to contact Dontai Carter after he refused participate with the first interview. He further stated that Mr. Scaggs did not provide him with the information for Ms. Caroline Herrera or Mr. Chris Carter, as a potential defense witnesses.

Mr. Trujillo testified that he did not canvas the 3600 block of Leyden Street, nor did he request Investigator Tinnes to canvas the block either. He did not follow up with an investigation of Dontai Carter's girlfriend, or make efforts to confirm that he was working at the drycleaners that day as stated. He testified that Mr. Chris Carter did not contact him, and that had Ms. Martin told him about Mr. Carter, he would have ensured that she follow up with him regarding the information he had about the case.

Trial counsel failed in their duty to conduct a sufficient pretrial investigation into potential witnesses and defenses. The exculpatory evidence which showed that Dontai Carter took the red shirt from Ms. Herrera's home, which contained DNA evidence of Ms. Scaggs, should have been introduced to the jury, as it provided an explanation as to why his DNA was at the scene. Further, the statements made to Ms. Herrera by Dontai Carter about doing something bad, and having the wrong guy, would have been substantially compelling towards establishing an alternate suspect defense. Moreover, the testimony from Chris Carter which identified Dontai Carter at the scene, later in the evening, without his shirt, admitting to shooting a person in the car beside them, was critical towards presenting a complete and effective defense.

Trial Defense counsels' failure to investigate Ms. Herrera and Mr. Chris Cater fell beneath the applicable standard required of criminal defense attorney's practicing in

Colorado, and as such, these failures amount to deficient performance. Thus, the record does not support the findings of the district court, and the denial of Mr. Scaggs' Rule 35(c) motion was error since his conviction was obtained in violation of his Sixth Amendment right to effective assistance of counsel.

## CONCLUSION

For the reasons set forth above, Mr. Scaggs respectfully asks this Court to grant his application and order the Respondents to release or retry him.

Dated: July 12, 2018

Respectfully Submitted,

s/ Alison L. Ruttenberg

_____
Alison L. Ruttenberg # 17497
PO Box 19857
Boulder, Colorado 80308
(720) 317-3834(Telephone)
(888) 573-3153 (Fax)
Ruttenberg@me.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2018, I served true copies of the foregoing Amended Petition for Writ of Habeas Corpus, by U.S. mail, postage prepaid, on Colorado Attorney General Cynthia Coffman, 1300 Broadway 10th Floor, Denver, Colorado 80203

s/ Alison Ruttenberg

_____

Alison L. Ruttenberg # 17497
PO Box 19857
Boulder, Colorado 80308
(720) 317-3834(Telephone)
(888) 573-3153 (Fax)
Ruttenberg@me.com